Thank you, counsel. You may proceed. Thank you. May it please the Court, Counsel Francine White here on behalf of the Appellant, Mr. Michael Glass. This is our appeal from a decision from the Workers' Compensation Comm'n that reversed and modified the arbitrator's decision in this case. Mr. Glass had been employed by YRC and on March 17, 2009, had an accident and injury while working while driving a forklift, unloading skids from a tractor-trailer when the dock plate between the semi-truck and the dock collapsed. He injured his back. He began treatment and eventually, was taken off of work and also surgery was then prescribed by a neurosurgeon. The case proceeded before an arbitrator on an immediate hearing under Section 19B and Section 8A because we were looking for the continuation of temporary total disability benefits, medical treatment, and for the authorization of the surgery that was being recommended by his neurosurgeon. The arbitrator found that the current condition of ill-being was due to the March 17, 2009 accident, that the temporary disability benefits should continue through the date of the hearing. All medical treatment rendered thus far was causally related and the surgery recommended by the neurosurgeon was causally related to the accident this gentleman had at work on March 17, 2009. A review to the commission resulted in a modification and reversal of the arbitrator's decision and specifically what the commission found was that this accident was a temporary exacerbation of an earlier to his back and that he returned back to his pre-status before the March 17, 2009 accident. They also found he was at maximum medical improvement as of February 10, 2010, which was the second IME appointment he had with the respondent or the company, Dr. Dr. Graff. They said that the surgery being recommended was not causally related to this accident and so they modified the entire decision of the arbitrator. The circuit court did confirm the commission's decision, but if you read the judge's comments when he made his decision, he realized that there were factual statements both ways and information both ways, but felt that he was compelled to affirm the commission's decision. We don't think that's the case. We feel that the petitioner has, by a manifest way to the evidence, proven that this March 17, 2009 accident did cause a new problem with his back that requires surgery. There is no question Mr. Glass had a prior back injury at work. He underwent three separate surgeries to his back, two in 2006, July of 2006, that were at the L4-5, L5-S1 levels, and then he underwent a fusion to the L4-S1 level. And he treated with Dr. Rowe, who was the neurosurgeon that performed all three surgeries. And after that last fusion, he went through an extensive physical therapy program, an extensive work conditioning program, and he gets released to go back to work, but he was doing full duty, absolutely no restrictions. And he does return to work. He returns to work in September of 2007. And there is nothing contained in this record that shows he has any other treatment until he has a one-year annual follow-up visit with Dr. Rowe, one year following that fusion that had been done by Dr. Rowe in 2007. He sees Dr. Rowe February 7, 2008. And he tells Dr. Rowe, yeah, I do have problems sometimes. My back still hurts. My leg still hurts. But I'm working. I've only had to take one day off from work. I can't take any kind of pain medication when I'm there because of the nature of the job and what I'm doing. Dr. Rowe examines him, says the fusion looks good, takes x-rays, sends him on his way. No restrictions. If you need some other pain medication, contact your primary care physician to give you some pain medication, because in all likelihood he would require some kind of pain medication off and on once you have a fusion to your back and you've undergone three separate surgeries. And you're working full time, unrestricted. He then continues to work and has this accident. And that's where everything does change. Because the surgery proposed by Dr. Massio Pinto, the neurosurgeon, following this March 17, 2009 accident and injury, is to go into a surgery at the L2, 3, L3, 4 levels. These are not the same levels that he had surgeries at before. And if you look at the medical records very carefully, the MRI that was done June 24, 2009, following this March 17 accident and injury, says first of all there's a satisfactory post-op appearance following the fusion from the L4 to S1. At the L2, 3 level and L3, 4 levels, there is facet arthritic changes and mild to moderate disc degeneration and bulging at these levels. Prior to the fusion that was performed in 2007, there was an MRI done, September 22nd of 2006. That MRI demonstrated that the L1, 2 levels and the L3, 4 levels remain normal. The L2, 3 level did have a broad-based bulge. But the L3, 4 level was normal. It's not normal after this March 17, 2009 accident. And Dr. Rowe, who was treating this gentleman all that time, performed three separate surgeries to him, two in July of 2006 and then the fusion in February of 2007, has the opportunity to see all these MRIs because he's the one ordering them, because he's the one treating him for his low back. And Dr. Rowe saw him in his office September 26, 2009. After that, September 22nd, 2006, MRI is done. And after that examination, the recommendation is only to do the fusion from the L4 to S1 level. This gentleman is never treated before March 17th, before that accident, before March 17th of 2009, he is never treated, never given any type of conservative treatment for those other levels in his lumbar spine. Dr. Rowe doesn't treat him. Dr. Rowe doesn't even say anything about him. Dr. Rowe's gone in there and done three surgeries and has never once gone in there to do anything at those levels. It's not until this accident and injury that he then has a problem at those two levels. And as Dr. Mascio-Pinto opined, and his report was admitted without objection at arbitration, said that this March 17, 2009 accident aggravated an underlying degenerative condition at these two levels. The L2, 3, L3, 4 levels, creating new radicular pain. And the surgery proposed by Dr. Mascio-Pinto is to go in and do a decompressive foramatomy, I think I said that correctly, where they go in and they free up the nerve groups so that you don't have this radicular pain. Never before had there ever been a recommendation for that, although this gentleman had all kinds of MRIs and all kinds of treatment for this back before that, but the treatment prior to this was at the different levels, the lower levels of the lumbar spine. So it's as a result of this accident and injury that we now have a significant physical change to this gentleman. He now has problems at two different levels of the back that he never had before. Also, at this time, he's now on stronger pain medication, because whatever he had been given before the fusion, and Dr. Rill said that he could continue to take if he had a rough day at work, he's now placed on fentanyl patches, which is for moderate to severe pain. This injury caused a significant problem for him. And if you look at the record completely, all of the records were admitted from Dr. Mascio-Pinto, and all of the records were admitted from Dr. Rill. And Dr. Rill's office, Rockford Spine Center, for the first time, Mr. Glass treated with him through the last date you saw him in February of 2008 when you released him and said, yep, he usually looks great, go back to work, continue what you're doing, and until he starts up again after this March 17, 2009 accident. There are no treating records in between. There is nothing there. He has no other treatment for his back until this accident and injury on March 17. He has no lost time from work. He loses one day from work, and he's having his annual, the one-year revisit for the fusion surgery with Dr. Rill, February 7, 2008. The company gives him FMLA paperwork and says, you know, if you're going to miss work, you've got to have this paperwork on file. So he brings it to Dr. Rill, and Dr. Rill fills it out and says, yeah, if you have pain, that you would be able to leave work. So it would be covered by FMLA. But he never used any FMLA time. The respondent made quite a deal about this, saying, well, he filled out this form and used the time. But what they offered and what's a part of the record is only the form that Dr. Rill completed that date. And if this gentleman would have used all of his FMLA time, they have those records. Those records should have come in. They should have offered that as an exhibit to say, hey, here they are. He used his 12 weeks. He didn't. He didn't use any of his time. Not until he gets hurt on March 17, 2009. This case mandates that the arbitrator's decision is correct. It is based upon the manifest weight of the evidence. It's very clear he gets injured on March 17, 2009. And he loses work following that because he's treating for it. And there's a change in his lumbar spine and now he needs another surgery. It's all related to this March 17, 2009 accident and injury only. It's not a temporary aggravation. This decision, this case here is very much like the two recent decisions from this court, the National Freight Industries case and also CALA, I think it is, KAWA, where you have a new injury, an accident, and there's a significant change to this individual. And there's medical to support it all. The commission decided to pick and choose from the records and did not truly look at the true medical records that were there. They didn't either read them all completely or they decided to just take something and grasp onto that. If you look at the full timeline and lay this out, you're going to find, yeah, we have a preexisting condition. We know that. We had treatment. We had surgery. We had effusion. But my God, we're back at work, full duty, no restrictions, and we have no treatment. And so we have this accident and injury, March 17, 2009, and now we have to have a surgery. So totally different levels of the back. The manifest weight of the evidence demonstrates that the arbitrator's decision is correct, and we would ask respectfully that the commission's decision be reversed and that the arbitrator's decision be reinstated. Thank you so very much. Thank you, counsel. Counsel, you may respond. May it please the court. Counsel, my name is Arik Hetu. I'm here representing YRC. This is a clear-cut, simple case, manifest weight of the evidence. I'm not going to belabor your honors with an exposition on that. You know what the relevant standards are for manifest weight. It's clearly briefed out. Judge Petraska had it right. This was a close call case. There are clear facts on both sides as to why the arbitrator ruled the way he did and to why the commission ruled the way they did. It is not the place of a reviewing court to substitute their opinions as to the facts. That is the commission's province. The commission decides the facts. We have facts on both sides here. This gentleman, Mr. Glass, had prior surgeries. He had a prior existing workers' compensation claim that was settled weeks before this injury occurred. He was obtaining narcotic medication for pain complaints weeks before this injury occurred. Both Dr. Machiopinto, the treating doctor, the second treating doctor, and Dr. Graff testified that the type of injury and treatment that he had from his prior surgeries would lead to further degeneration at the levels above and below where the fusion site was. Dr. Walker was the first doctor to treat Mr. Glass after his March 2009 accident. She opined that everything he was complaining about was related to his prior lumbar surgeries, not to this accident. There's no question that the arbitrator had facts to base his decision on. There's also no question that the commission had facts to base their decision on. Well, what about this L234 normality? Now it's no longer normal. It needs treatment. I would turn, Your Honor, to Dr. Machiopinto's testimony in his deposition where he testified that the levels above a fusion site will tend to have degenerative problems later on as time goes on. Yep, as time goes on. This is years later. This is years after his fusion. Time has gone on. These are degenerative issues. There was not an acute traumatic change at those levels. These are degenerative problems at those levels, which Dr. Walker opined in her records, which Dr. Graff testified to in his deposition. These issues that are present above and below, and let me turn briefly to the question of... Does it seem from a chain of events analysis that they become symptomatic after this incident? I don't think that's clear, Your Honor. I think it's clear that he was taking narcotic pain medication prior to this injury, which clearly demonstrates that there was pain complaints in the back. As to what level, Dr. Machiopinto specifically testified that it was in relation to new radicular complaints in the left leg. But the records from his physical therapy and from Dr. Rowe following his recovery after the prior fusion surgery demonstrated and articulated left leg radicular complaints. They were not new. Same location, same distribution. These complaints existed. They existed before the accident. They existed after the accident. Dr. Graff testified, and the commission relied on that testimony, that Mr. Glass's condition was not aggravated or accelerated by this injury. There is no question that he has problems in the back. There is no question that he requires treatment. Did Mr. Graff opine that the March 17, 2009 accident caused a temporary exacerbation of his pain? From previous injuries, and that he later returned to a baseline? He did opine that, yes. Well, a temporary exacerbation is an aggravation. It is temporary, yes. Yeah, but it's still an aggravation. I don't necessarily agree that it would be an aggravation to the point that it would be a compensable injury to that the surgery would be compensable. I'm only taking the issue with your statement that you made to the court that said that the event did not cause an aggravation. It was a precondition. That's not what Graff said. Let me rephrase. Dr. Graff testified that the event caused a temporary aggravation. Exacerbation. Correct. He did not testify that it accelerated the injury or that it was the cause of the need for surgery. And Dr. Mascio-Pinto is the only doctor in this record that has testified that the March 17 event is the cause of the need for surgery. Dr. Mascio-Pinto's opinions were qualified. It's not clear that he had access to the narcotic pain medication prescriptions or filling of prescriptions. That's not evidenced anywhere in the record. And it's clear that he had relied on incorrect information that the left leg complaints were new when, in fact, they're demonstrated in the record prior to the March 17 event. That's all I have, Your Honors. Thank you. Thank you, Counsel. Counsel, you may reply. Just briefly, there is something very new. And that this gentleman has no treatment between the fusion, after he has his fusion and returns to work September 7th until he sees Dr. Rowe one time for his follow-up visit, and has absolutely no treatment until after this accident. And then he has to have continuing treatment. And there's a recommendation for surgery. So that's something new, because the symptoms are different. They're stronger. They require him to seek the care and treatment of a doctor, and there's a recommendation for a surgery. And we're dealing with a totally new level. And that there is no question of. That MRI is as clear as it can be. And Dr. Maceo-Pinto writes the report, which is not objective, to saying this accident aggravated any underlying condition he has. And it produced new, ridiculous pain. If this gentleman had been in so much pain, and it was ridiculous, before this March 17th, 2009 accident, he would have been back seeing a doctor. He wasn't. He was working. He was working full-time, unrestricted duty. He worked very hard to get back to work after that fusion. And all this gentleman wanted to do now was get the surgery done so he could try and get back to work once again. This March 17th, 2009 accident was significant. When that dock plate broke and his forklift went down, Pinto called another team of workers to come over and help lift the whole thing out. That was a jolt. And that created a change in this gentleman's lumbar spine. And it was no temporary aggravation. I would hope that you ñ I believe that the manifest weight of the evidence truly does provide you with an opposite conclusion as to what the commission decided, because that decision is not with the manifest weight of the evidence. I thank you very much. Thank you, counsel, both, for your very fine arguments this morning on this matter. It will be taken under advisement and a written disposition shall issue. The court will be in recess, subject to call.